**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JOHN W. BARBER, DEBRA L. BURTON, DAVID R. GRINNELL, TIMOTHY J. LEES, MARSHALL L. THOMAS,** *individually and on behalf of all persons who currently reside in Colonial II Apartments therein at any time from December 2013 to date*,

                                **Plaintiffs,**

   vs.                                                    **6:16-cv-1529**
                                                           **(MAD/TWD)**

**ROME HOUSING AUTHORITY, JAMES BALDWIN,** *individually and as Executive Director of Rome Housing Authority*, **DARCEL PULEO,** *individually and as Property Manager of Colonial II Apartments,*

                                  **Defendants.**
_____

**APPEARANCES:**                                **OF COUNSEL:**

**LEGAL SERVICES OF CENTRAL**               **ASHLEY M. KAPLAN, ESQ.**
**NEW YORK, INC. - UTICA**                  **SAMUEL C. YOUNG, ESQ.**
268 Genesee Street
2nd Floor
Utica, New York 13502
Attorneys for Plaintiffs

**LIPMAN LAW FIRM, P.C.**                   **JEFFREY M. LIPMAN, ESQ.**
1454 30th Street
Suite 205
West Des Moines, Iowa 50266
Attorney for Plaintiffs

**LEGAL SERVICES OF CENTRAL**               **SAMUEL C. YOUNG, ESQ.**
**NEW YORK, INC. - SYRACUSE**
221 South Warren Street
Suite 300
Syracuse, New York 13202
Attorney for Plaintiffs

**TOWNE, RYAN & PARTNERS P.C.**             **JOHN W. LIGUORI, ESQ.**

450 New Karner Road            **MARK T. HOUSTON, ESQ.**
P.O. Box 15072
Albany, New York 12212
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

On December 23, 2016, Plaintiffs filed a putative class action complaint pursuant to Federal Rule of Civil Procedure 23 for injunctive and compensatory relief. Plaintiffs allege that the Rome Housing Authority ("RHA"), its Executive Director, James Baldwin, and the property manager of the Colonial II Apartments ("Colonial II" or the "Building" collectively "Defendants") are liable under 42 U.S.C. § 1983 and state law. *See* Dkt. No. 1 at ¶¶ 1, 59-84. On March 22, 2017, Plaintiffs filed an amended complaint. *See* Dkt. No. 24.

Currently before the Court is Defendants' motion to dismiss. For the following reasons, the motion is granted.

### II. BACKGROUND

The Colonial II Apartments is a seven-story apartment building that caters to elderly and disabled adults and is owned and managed by RHA. *See* Dkt. No. 24 at ¶¶ 5, 10, 13. In 2008, Colonial II's residents began complaining to the Building's management that bed bugs were infesting their apartments. *See id.* at ¶ 18. By 2013, Colonial II faced a severe infestation. *See id.* That year, "Defendants hired a local, two-person extermination company, Rid-O-Vit," to inspect and chemically treat the infestation unit-by-unit. *Id.* at ¶¶ 19, 41. The Building's residents "complained to Defendants that the inspections and spraying . . . were not eradicating the bed bug problem, and were spreading the problem to new apartments and other areas of the building." *Id.* at ¶ 20. Defendants continued to use Rid-O-Vit despite these complaints. *See id.* at ¶ 21.

According to the amended complaint, Defendants did not mention the infestation to prospective tenants or residents renewing their leases. *Id.* at ¶ 22. Further, Defendants did not mention the infestation in "resident meetings, notices, or other communications," and told at least one resident to keep quiet about the bed bugs. *Id.* Some residents "complained about bed bugs within their apartments, but were told by Defendants that they were unable to find any. On [these] occasions, Defendants did not take any remedial actions despite [r]esidents complaining that they had identified bed bugs within their apartments and experienced bites from bed bugs." *Id.* at ¶ 24. Further, "Defendants . . . told one or more [r]esidents that they should refrain from visiting family and friends in other apartments within the building, or in homes or apartments outside the building, because of the risk of spreading bed bugs, or bringing bed bugs into the Colonial II building." *Id.* at ¶ 27.

The infestation has been traumatic for the tenants. Some have had difficulty sleeping due to anxiety about being bitten, they risked infections and allergic reactions, and have been subjected to the general stigma associated with bed bugs. *See id.* at ¶ 25. Some residents have left their homes to sleep in other places. *See id.* at ¶ 26. Many residents have been anxious about spending time with their friends and family due to a fear of carrying the bed bugs with them. *See id.* at ¶¶ 27-28. John W. Barber, Debra L. Burton, David R. Grinnell, Timothy J. Lees, and Marshall L. Thomas ("Plaintiffs") are tenants of Colonial II and represent the class of residents that have lived in Colonial II at any time after December, 2013. *See id.* at ¶ 1. They allege that this infestation has resulted in significant hardship. *See id.* at ¶ 47.

Plaintiff Barber has lived in Colonial II since the early 1990s and was one of the first tenants to notice bed bugs in his apartment. *See id.* at ¶¶ 48-49. RHA first treated his apartment for bed bugs in 2008, but the bed bugs eventually came back. *See id.* at ¶ 49. The bed bugs have

3

led Plaintiff Barber to suffer from bites, sleep deprivation, and anxiety. *See id.* at ¶ 51. Additionally, the bed bugs have exacerbated Plaintiff Barber's preexisting physical and mental health conditions. *See id.*

Plaintiff Burton moved into Colonial II in May 2016 after being told she would not need to worry about bed bugs because she was a "clean person." Dkt. No. 24 at ¶ 55. Plaintiff Burton first noticed bed bugs in her apartment two months later. *See id.* at ¶ 56. Since July 2016, she has had her apartment sprayed six times. *See id.* Plaintiff Burton asked Colonial II management for a building wide eradication instead of the unit-by-unit approach. *See id.* at ¶ 58. Plaintiff Burton has spent money on chemical sprays and other cleaning supplies to fight the infestation and is withholding her rent due to the ongoing condition of her apartment and the need to purchase new furniture and chemicals to combat the infestation. *See id.* at ¶ 59.

Plaintiff Grinnell moved into Colonial II in June 2013. *See id.* at ¶ 60. Approximately one-year later, he noticed bed bugs in his apartment. *See id.* at ¶ 62. Defendants treated his unit, which temporarily eliminated the pests. *See id.* at ¶¶ 62-63. However, in September 2016, the bed bugs returned and he has sprayed his unit monthly and at his own expense since their return. *See id.* at ¶¶ 63-64. Plaintiff Grinnell also suffers from bites, sleep deprivation, and anxiety. *See id.* at ¶ 64.

Plaintiff Lees has resided in Colonial II since 2012. *See id.* at ¶ 65. He first noticed the bed bugs in 2014. *See id.* at ¶ 66. Since then, Defendants have sprayed his apartment approximately twenty times. *See id.* "[Plaintiff] Lees has not visited family in over two years because of the fear that he would carry bed bugs into their homes," which has led to him being socially isolated and depressed. *Id.* at ¶ 68. "He has experienced physical bites, sleep deprivation, and anxiety due to the bed bug infestation." *Id.* Living under these conditions has

adversely affected his mental health treatment and recovery process. *See id.* Plaintiff Lees spends his own money to spray his apartment on a monthly basis and has been forced to throw away furniture because of the infestation. *See id.* at ¶¶ 67-68.

Plaintiff Thomas has been living in Colonial II since 2004. *See id.* at ¶ 69. She first noticed bed bugs in her apartment in 2012. *See id.* at ¶ 70. Defendants have sprayed her apartment at least nine times. *See id.* She has repeatedly had to throw out furniture due to the infestation. *See id.* Plaintiff Thomas has spent money on sprays and cleaning supplies. *See id.* at ¶ 72. She is currently taking medication to assist with the anxiety and sleep deprivation caused by the bed bugs. *See id.*

In 2014, Legal Services of Central New York, Inc., acting on behalf of Plaintiff Barber, provided Defendants with reports from various federal agencies that guide public housing administrators in preventing and managing bed bug infestations. *See id.* at ¶¶ 35-37. One report, a joint statement on bed bugs issued by the Environmental Protection Agency ("EPA") and Center for Disease Control ("CDC") noted that "[c]ontrol in multi-family homes is much more difficult than in single family homes because bed bugs frequently travel between units, either by direct transport by humans or through voids in the walls." Dkt. No. 24-1 at 17. The same report noted that aside from the direct harms associated with bed bugs, there is also a public health concern arising from the risks associated with tenants attempting to combat an infestation themselves. *See id.* Attempts to chemically treat units not only pose a threat to the tenants, but can also exacerbate an infestation by making the bed bugs resistant to pesticides. *See id.*

These reports also included guidelines promoting Integrated Pest Management ("IPM"), an economical approach aimed at preventing and treating bed bug infestations by focusing on extensive monitoring and community awareness and the judicious use of pesticides. *See, e.g.*, *id.*

5

at 19; Dkt. No. 24-2 at 3. This plan suggests that administrators should have inspectors inspect the infested unit and units adjacent to the infested unit when a tenant complains about bed bugs. *See, e.g.*, Dkt. No. 24-1 at 46; Dkt. No. 24-2 at 12. Further, if the inspectors find bed bugs, "the unit and surrounding units should be treated for bedbugs according to the IPM Plan," which includes chemical treatments. Dkt. No. 24-2 at 12.

Plaintiffs allege that Defendants are liable under 42 U.S.C. § 1983 because their efforts to treat the bed bug infestation violated Plaintiffs' rights to substantive due process under the Fifth and Fourteenth Amendments. They claim that Defendants exacerbated the infestation through their continued use of Rid-O-Vit, and that their extermination methods, failure to disclose the infestation to current tenants, and occasional decision to not treat apartments after bed bug reports were egregious actions that injured Plaintiffs. Plaintiffs also seek relief against Defendants for the state law claims of statutory deceptive acts and practices, negligence, unjust enrichment, breach of implied warranty of habitability, and breach of contract.

### III. DISCUSSION

**A.   Standard of Review**

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may

6

consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Id.* (quoting *Twombly*, 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[] complaint must be dismissed[,]" *id.* at 570.

**B.    Substantive Due Process**

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) (quoting 42 U.S.C. § 1983). Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent

7

damages that the plaintiff sustained. *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y. 1991) (citing *Martinez v. California*, 444 U.S. 277, 285 (1980)). For a plaintiff to recover in a § 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions. *See id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v, Doyle.*, 429 U.S. 274, 286 (1977)) (other citation omitted).

The Due Process Clause of the Fourteenth Amendment protects persons against deprivations of "life, liberty, or property." U.S. Const. amend. XIV, § 1. However, the scope of substantive due process is very limited. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). The Due Process Clause "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago Cty. Dept. of Soc. Serv.*, 489 U.S. 189, 195 (1989). The Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (citation omitted).

Absent a custodial relationship between a state official and the plaintiff, an official cannot be liable for depriving a victim of substantive due process rights unless the official played a role in creating the danger. *See Matican v. City of New York*, 524 F.3d 151, 156 (2d Cir. 2008); *Pena v. DePrisco*, 432 F.3d 98, 109 (2d Cir. 2005). To state a claim under the state created danger doctrine, the complaint must allege that (1) a government official took an affirmative act that created the danger and (2) the official's conduct was so egregious that it shocks the contemporary conscience. *See Lombardi v. Whitman*, 485 F.3d 73, 79-81 (2d Cir. 2007).

8

Here, Plaintiffs assert that Defendants are liable for violating their substantive due process rights through the state created danger doctrine.

### *1. Deliberate Indifference*

"In order to shock the conscience and trigger a violation of substantive due process, official conduct must be outrageous and egregious under the circumstances; it must be truly brutal and offensive to human dignity . . . ." *Lombardi*, 485 F.3d at 81. "[N]egligently inflicted harm is categorically beneath the threshold of constitutional due process. . . . [Conversely,] conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) (citations omitted). In between these two extremes is deliberate indifference, which may, under certain circumstances, shock the conscience. *See id.* at 849; *Lombardi*, 485 F.3d at 82.

"As the very term deliberate indifference implies, the standard is sensibly employed only when actual deliberation is practical . . . ." *Lewis*, 523 U.S. at 851. "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Com'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410 (1997); *see Okin v. Village of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 432 (2d Cir. 2009) (using custodial relationship deliberate indifference case law for state-created danger analysis).

Deliberate indifference can be inferred where the result of the conduct is obvious. *See Okin*, 577 F.3d at 432. In *Okin*, the plaintiff made multiple complaints over a fifteen-month period to the local police. *See id.* at 431. The police, who were friends with the plaintiff's abusive spouse, "openly expressed camaraderie with [the plaintiff's spouse] and contempt for

9

Okin. The officers' conduct, both in response to that first complaint and thereafter, could be viewed as ratcheting up the threat of danger to Okin," satisfying the affirmative act prong of the state created danger test. *Id.* at 430. The Second Circuit further held that these complaints established sufficient awareness of the danger to satisfy the deliberate indifference prong of the state created danger analysis because the risks of domestic violence are common knowledge. *See id*. at 431-32. The panel noted that because the dangers associated with domestic violence are commonly known, the officers should have been aware that their conduct exacerbated the danger that the plaintiff faced. *See id.* Thus, the officers' conduct was "not necessarily attributable to a failure to appreciate the gravity of the situation, and thus [could not] definitively be characterized as mere negligence." *Id.* at 432.

In the present matter, the eight years following the initial report of bed bugs was sufficient time for deliberation. However, Plaintiffs fail to plausibly allege that Defendants knew, or had reason to know, that the unit-by-unit treatment exacerbated the infestation. Thus, the amended complaint does not include facts that, if true, would plausibly establish deliberate indifference.

Further, it is not plausibly alleged that it is so commonly known that unit-by-unit treatment will spread an infestation as to make it obvious. It is common knowledge that bed bugs spread easily. Even the amended complaint recognized this, noting that Defendants and some residents were concerned that residents could cause the bed bugs to spread. Similarly, the federal reports attached to the amended complaint note that bed bugs can easily spread within a building through people or gaps in the walls. At best, the amended complaint's allegations concerning the continued use of Rit-O-Vit and unit-by-unit treatments alleges negligent conduct, not rising to the level of deliberate indifference.

10

Plaintiffs also allege that Defendants were given reports of federal guidelines for dealing with bed bug infestations. However, the amended complaint did not cite to, nor could this Court find, any specific passage in these reports that linked unit-by-unit treatment to exacerbating the infestation. These reports cannot be interpreted as an obvious warning that unit-by-unit treatment will exacerbate an infestation. All that these reports stated was that a recognized approach for treating an infestation is for the infested unit, and the units connected to the infested unit, to be chemically treated. The reports do not state that a unit-by-unit spraying will worsen an infestation.

Finally, the amended complaint alleges that some residents notified Defendants that the unit-by-unit treatments were exacerbating the infestation. At best, these allegations suggest that the same residents disagreed with the method used by the exterminators. As a whole, the amended complaint alleges that Defendants repeatedly had professional exterminators deal with this problem. For example, Plaintiff Thomas alleges that the exterminators have sprayed her apartment at least nine times in response to her complaints. *See* Dkt. No. 24 at ¶ 70. Such allegations are insufficient to rise to the level of deliberate indifference.

Although Plaintiffs have alleged that in recent years the chemical treatment became ineffective, Defendants persisted in their attempts to deal with the infestation by treating individual apartments, as many as twenty times over a three-year period. This case is distinct from *Okin*. The decision in *Okin* was not based solely on the defendants' failure to act in the face of an obvious risk. Instead, the panel concluded that the risks associated with the defendants' conduct was so obvious that a jury could have found that the defendants were aware that their actions exacerbated the risk. Conversely, in the case at hand, it was by no means obvious that the unit-by-unit treatments would cause the infestation to spread. Thus, the amended complaint fails

11

to plausibly allege that Defendants knew, or should have known, the alleged effects of their actions.

### 2. Shocking the Conscience

Even when a plaintiff can establish deliberate indifference, they must still demonstrate that it shocks the conscience. *See Lewis*, 523 U.S. at 849. The "shock the conscience" standard is not easily met; the plaintiff must show that the government's conduct was "egregious" and "outrageous," "not merely incorrect or ill-advised." *Ferran v. Town of Nassau*, 471 F.3d 363, 369-70 (2d Cir. 2006) (quotation omitted). Determining whether an act of deliberate indifference is shocking is based on the totality of the circumstances, as "[d]eliberate indifference that shocks the conscience in one environment may not be so patently egregious in another . . . ." *Lewis*, 523 U.S. at 849. "[C]ourts should operate from a 'presumption that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces.'" *Lombardi*, 485 F.3d at 84 (quoting *Collins v. City of Jarker Heights*, 503 U.S. 115, 128 (1992)). The presence of significant countervailing obligations will preclude official actions from shocking the conscience. *See id.* at 83 (citing cases). Where a municipal official must allocate risk, the decision "may be a burden on the conscience of the one who must make the decisions, but does not shock the contemporary conscience." *Id.* at 85. In this situation, "only an intent to cause harm arbitrarily can shock the conscience in a way that justifies constitutional liability." *Id.* at 75.

In *Lombardi*, the plaintiffs alleged that the EPA knowingly made false statements in the wake of September 11 that there was no risk to public health in the area surrounding Ground Zero. *See id.* at 77. The Second Circuit found that the EPA held a countervailing obligation to

12

restore order after the attack and, because of this obligation, even if the EPA was deliberately indifferent, their actions did not shock the conscience. *See id*. at 83, 85.

In the present matter, even though Plaintiffs contend that Defendants' extermination efforts exacerbated the bed bug situation and caused additional harm to Plaintiffs, such conduct cannot be said to "shock the conscience," so as to give rise to a due process claim. *See Allen v. N.Y.C. Housing Auth.*, No. 10 Civ. 168, 2012 WL 4794590, *9 (S.D.N.Y. Sept. 11, 2012) (citing *Kaucher v. County of Bucks*, 455 F.3d 418, 431 (3d Cir. 2006)). Quite simply, even assuming that Defendants' attempts to address the bed bug situation were misguided, the conduct described cannot be considered conduct that is "truly brutal and offensive to human dignity" so as to constitute a constitutional violation. *See Lombardi*, 485 F.3d at 81 (citation omitted).

At best, the facts alleged in the amended complaint constitute negligent conduct, which is patently insufficient to support a substantive due process claim. *See Lewis*, 523 U.S. at 848-49; *Collins*, 503 U.S. at 128-29. While Plaintiffs may have stated a claim sounding in state tort law, there is a significant distinction between a tort and a constitutional wrong. The "Due Process Clause 'does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society.'" *Collins*, 503 U.S. at 128 (quotation omitted).

In their response, Plaintiffs argue that "[b]y continually ignoring residents' complaints for over three years, Defendants' actions may be said to be abuses of power. Defendants were the only people in a position of power to stop the ongoing harm and perform building-wide remediation." Dkt. No. 30 at 18. The amended complaint makes clear, however, that Defendants did not simply ignore Plaintiffs' complaints. Rather, they repeatedly hired exterminators to deal

13

with the situation. The fact that Defendants' extermination efforts were unsuccessful does represent sufficiently egregious conduct to support a substantive due process claim.

Taking all of the well-pleaded facts in the amended complaint as true, the Court finds that Plaintiffs have failed to allege any conduct "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8. Given that the complaint fails to satisfy the conscience shocking prong of the state-created danger test, the Court declines to rule on whether Defendants' conduct constitutes an affirmative act.

For the foregoing reasons, Defendants' motion to dismiss Plaintiffs' claim for a violation of substantive due process is granted.[1]

## C.   State Law Claims

Application of supplemental jurisdiction is discretionary, and "it requires a balancing of the considerations of comity, fairness to the litigants, judicial economy, and the avoidance of needless decisions of state law." *Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 809 (2d Cir. 1979) (citation omitted). The Second Circuit has held that "'if [all] federal claims are dismissed before trial . . . the state claims should be dismissed as well.'" *Castellano v. Bd. of Tr.*, 937 F.2d 752, 758 (2d Cir. 1991) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343,

---

[1] Plaintiffs suggest that this Court should follow the recent decision in *Stewart v. Wuakegan Hous. Auth.*, No. 1:13-cv-08444, Dkt. No. 33 (N.D. Ill. Sept. 30, 2016). Although the facts of *Stewart* are nearly identical to the matter currently before the court, this Court disagrees with the analysis and declines to follow. The *Stewart* court reached its decision because "a fully developed factual record could [] show that the defendants" were liable under the state created danger doctrine. *Id.* at *5. However, the standard for a motion to dismiss is whether the allegations contained in the pleadings are sufficient to substantiate the plaintiff's claim, not whether discovery may yield additional facts demonstrating liability. *See Twombly*, 550 U.S. at 555. As previously discussed, the facts alleged in the amended complaint are not sufficient to establish conscience shocking conduct. Therefore, this claim must be dismissed.

350 & n.7 (1988) (enumerating several factors that courts should weigh in considering whether to exercise supplemental jurisdiction—"the values of judicial economy, convenience, fairness, and comity"—and suggesting that, "in the usual case in which all federal-law claims are eliminated before trial, the balance of [those] factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims").

Given that the only remaining claims are based in state law, the Court declines to exercise supplemental jurisdiction over any such claims and dismisses them without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS**, that Defendants' motion to dismiss (Dkt. No. 27) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 30, 2018
      Albany, New York

Mae A. D'Agostino
U.S. District Judge